## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 28 2018, 10:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anna Onaitis Holden
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of A.D. (Minor Child), | September 28, 2018 |
| and | Court of Appeals Case No. 18A-JT-837 |
| G.D. (Mother), | Appeal from the Marion Superior Court |
| *Appellant-Respondent,* | The Honorable Gary K. Chavers, Judge Pro Tempore |
| v. | The Honorable Larry E. Bradley, Magistrate |
| The Indiana Department of Child Services, | Trial Court Cause No. 49D09-1709-JT-765 |
| *Appellee-Petitioner.* | |

**Bailey, Judge.**

# Case Summary

G.D. ("Mother") appeals the termination of her parental rights as to A.D. ("Child"), alleging that the juvenile court clearly erred in ordering termination.[1]

We affirm.

# Facts and Procedural History

In March 2016, the Indiana Department of Child Services ("DCS") was concerned that Child and his half-siblings (collectively, the "Children") were experiencing educational neglect due to issues with school attendance. After DCS filed a petition alleging that Child was a Child in Need of Services ("CHINS"), Child remained with Mother. When attendance issues persisted, Child was placed with a relative of one of his half-siblings.

In May 2016, Child was adjudicated a CHINS, in part because Mother had difficulty maintaining utilities at her residence. The plan was for reunification with Mother, who was ordered to participate in home-based therapy and case management, and to follow all recommendations. Eventually, DCS filed a petition to terminate Mother's parental rights as to Child. The juvenile court

---

[1] The juvenile court previously terminated the parental rights of Child's father, who does not actively participate in this appeal.

held a final hearing on March 8, 2018, at which point Child was six years old. The court later entered an order terminating Mother's parental rights.

[5] In its order, the juvenile court found that Mother "had trouble maintaining appropriate housing," and had "acknowledged being evicted in January of 2018 and being homeless." App. Vol. II at 14. The court found that although Mother had obtained assistance moving into a motel within a week of the hearing, she had formerly "been living out of her car," which she drove despite lacking a license and having had "convictions for driving without a license." *Id.* The court also found that, since the CHINS case had been opened, Mother had "obtained, but did not maintain, at least five jobs." *Id.* As to home-based therapy, the court found that Mother had been referred several times, and that it was "last closed out unsuccessfully . . . for noncompliance." *Id.* With respect to case management, the court found that Mother's goals included "maintaining housing and employment, creat[ing] a budget, obtaining a driving license, obtaining her GED," and engaging in parenting education, but that "none of the . . . goals had been successfully addressed." *Id.* The court further found that Mother "takes no responsibility for her lack of progress[], . . . had been difficult for providers to reach and deal with, and . . . had not been participating in parenting time on a consistent basis." *Id.* at 15. As to supervised parenting time, the court found that Mother "missed approximately forty-five visits, and cut visits off short several times." *Id.* at 14. The court also expressed concern about Mother's judgment, observing that Mother (1) had resisted direction to have the Children wear seatbelts and (2) had demonstrated

"inappropriate behavior during parenting time" with Child, including "discussing the CHINS case and complaining" about DCS. *Id.* The court also identified an incident after a court hearing when Child was removed from Mother's care; Mother became upset and told Child "to run." *Id.* at 13.

Mother now appeals.

# Discussion and Decision

"A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Our General Assembly has thus set a high bar for terminating parental rights." *In re Bi.B.*, 69 N.E.3d 464, 465 (Ind. 2017).

Under Indiana Code Section 31-35-2-4(b)(2), a petition seeking to terminate the parent-child relationship must allege, in pertinent part:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree. . . .
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. . . .
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[9] The petitioner must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2. If the court finds that the allegations are true, "the court shall terminate the parent-child relationship." I.C. § 31-35-2-8(a). In doing so, the court must enter findings and conclusions, irrespective of whether the parties have made a Trial Rule 52 request. *See* I.C. § 31-35-2-8(c); Ind. Trial Rule 52. We will not "set aside the findings or judgment unless clearly erroneous," T.R. 52(A); clear error is "that which leaves us with a definite and firm conviction that a mistake has been made," *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). In reviewing for clear error, we look to "whether the evidence supports the findings, and whether the findings support the judgment." *Steele-Giri v. Steele*, 51 N.E.3d 119, 123 (Ind. 2016). Moreover, we neither reweigh the evidence nor judge the credibility of witnesses, *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016), and we give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses," T.R. 52(A).

# Challenged Findings

[10] Mother first focuses on whether certain findings lack evidentiary support. We address each challenged finding in turn, beginning with the following finding:

> [Child] was found to be in need of services as to his mother on December 22, 2016, after a fact-finding hearing, at which time the CHINS Court found, [in part], that the family had trouble maintaining utilities and were facing eviction. *[Mother] acknowledged that she needed assistance from [DCS] to maintain housing, and that she needed counseling and therapy for her children*.

App. Vol. II at 13 (emphasis added). Mother "challenges the italicized portion of the finding," asserting that "it is not a complete and accurate reflection of the evidence" because "[t]he finding does not recognize that [Mother's] acknowledgment was limited to the time around the CHINS evidentiary hearing; it is not a broad admission of ongoing need or need at the time of the evidentiary hearing in the termination case." Appellant's Br. at 21. However, we agree with DCS that, "[w]hen read in context, the finding reflects that Mother's acknowledgment was at the time of the CHINS factfinding hearing." Appellee's Br. at 19. Thus, we discern no clear error as to this finding.

[11] Mother also challenges the following finding: "[Mother] has been inconsistent in attending parenting time sessions. During one stretch of time, she had missed approximately forty-five visits, and cut visits off short several times." App. Vol. II at 14. Mother contends that this finding "does not reflect the many parenting time sessions Mother *did* attend," asserting that the finding is "incomplete and inaccurately describes her participation in visits with her son

over a long period of time." Appellant's Br. at 22. Yet, we cannot accept Mother's invitation to reweigh evidence—which supports the finding that Mother had been inconsistent in attending her parenting sessions with Child.

[12] Next, Mother challenges a pair of findings related to her progress: (1) that "[n]othing has changed since the change in the permanency plan, and there has been no progress made," and (2) that Mother "has made minimal progress in addressing issues of instability and parenting skills in the . . . years the CHINS case has been pending." App. Vol. II at 13, 14. Mother argues that these findings "are not supported by the evidence because there is evidence Mother made progress on a number of fronts." Appellant's Br. at 23. Yet, at bottom, Mother is again requesting that we reweigh the evidence, which we cannot do.

[13] Rather, even if the finding that "[n]othing has changed since the change in the permanency plan, and there has been no progress made" appears a bit hyperbolic, App. Vol. II at 13, the evidence fairly supports the court's other related finding that Mother had made minimal progress since DCS became involved. Indeed, there was testimony that Mother continued to perceive DCS as the enemy and that she struggled with accepting "the reality of the situation." Tr. Vol. II at 80. One service provider testified that Mother made some progress toward therapeutic goals—including progress in managing her schedule and attending visits—but that Mother would "forget[] what the goal is and what the focus should be," ultimately making "[v]ery little" overall progress. Tr. Vol. II at 79-80. That service provider also testified that "[t]here was no moving forward." *Id.* at 80. Further, the evidence indicates that

stability—in particular, housing stability—remained an issue in Mother's life. That is, although Mother had secured a motel room in the week before the hearing, she had previously been living out of a car that she was not legally allowed to drive; Mother had been sleeping in the car overnight in a storage unit, and she had declined to stay at shelters that service providers had helped her locate. Mother admitted that her employment had been "very unstable." Tr. Vol. II at 24. There was also evidence that Mother continued to engage in inappropriate conversations with Child, and that Mother did not engage in services aimed toward improving her parenting skills. According to one witness, it seemed that Mother "felt her children did not need redirection and she did not need parenting skills." Tr. at 94. Thus, we are not persuaded that the court clearly erred in its characterization of progress.

[14] Finally, Mother challenges the juvenile court's finding that "[s]ince November 15, 2017, seventeen *parenting time sessions* were scheduled" and Mother "'no showed' six times and cancelled once.'" App. Vol. II at 14 (emphasis added). Mother asserts—and DCS concedes—that this attendance-related finding "matches . . . testimony relat[ing] to the *home-based case management services*" but "not parenting time as the juvenile court's finding states." Appellant's Br. at 23 (emphasis added); Appellee's Br. at 21 ("If the court was referring to visits, then . . . the court's use of 'parenting time sessions' is not correct."). Yet, "[s]pecial findings, even if erroneous, do not warrant reversal if they amount to mere surplusage and add nothing to the trial court's decision." *Bell v. Clark*, 653 N.E.2d 483, 489 (Ind. Ct. App. 1995), *opinion adopted*, 670 N.E.2d 1290 (Ind.

1996). Thus, we must proceed to consider whether the remaining findings support the juvenile court's decision to terminate Mother's parental rights.

## Remedying of Conditions

[15] In challenging the decision to terminate her parental rights, Mother does not dispute that Child had been removed for the requisite period, that termination is in Child's best interests, and that adoption is a satisfactory plan for the care and treatment of Child. *See* I.C. § 31-35-2-4(b)(2). Rather, Mother focuses only on the court's determination that "[t]here is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside the home will not be remedied." App. Vol. II at 15.[2]

[16] "In making [its] decision[], 'the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *K.T.K. v. Ind. Dep't of Child Services*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quoting *Bester*, 839 N.E.2d at 152). When reviewing the court's determination on appeal, we engage in a "two-step" analysis: "First, we must ascertain what conditions led to . . . placement and retention [outside

---

[2] This determination corresponds to the statutory basis for termination set forth in Indiana Code Section 31-35-2-4(b)(2)(B)(i). Notably, however, that portion of the statute sets forth alternative grounds for termination, requiring only "that one (1) of the following is true." I.C. § 31-35-2-4(b)(2)(B). Mother does not directly challenge the court's determination—under an independent, alternative ground—that there is a reasonable probability that continuation of the parent-child relationship poses a threat to Child's wellbeing. *See* I.C. § 31-35-2-4(b)(2)(B)(ii). Nevertheless, we address Mother's specific challenge to the first statutory ground.

the home].  Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotation marks omitted).

[17]  Here, one circumstance underlying the CHINS adjudication was Mother's difficulty maintaining utilities at her residence.  Moreover, Mother's lack of stability was a reason for Child's continued placement outside of the home. Mother admits that, at the time of the final hearing, she "was more prepared to care for her son in some ways and less in others," in that "sometimes she had housing but not employment; sometimes she had employment but not housing; and sometimes she participated more consistently in services than other times." Appellant's Br. at 26.  Mother asserts that "[a]lthough she often did not have all of her ducks in a row at the same time, she did show that she was capable of making progress toward all her goals, even if that progress was staggered." *Id.* Mother further argues that a "constant . . . throughout this case" is her "ability to rebound from difficult situations," and that she "has an established history of correcting the less-than-ideal situations in which she finds herself." *Id.*

[18]  Yet, insofar as evidence suggests that Mother has the ability to rebound, the evidence also suggests that Mother repeatedly finds herself in difficult situations—and has not demonstrated an ability to consistently provide a safe, stable home for Child.  *See In re Campbell*, 534 N.E.2d 273, 275 (Ind. Ct. App. 1989) (noting an unwillingness to put a child "on a shelf" until parents are capable of providing appropriate care).  Ultimately, we cannot say that the court clearly erred in determining that there was a reasonable probability that the pertinent underlying conditions would not be remedied.  As Mother does

not challenge the juvenile court's determinations with respect to other statutory elements—and having identified clear and convincing evidence supporting those elements—we affirm the decision to terminate Mother's parental rights.

[19] Affirmed.

Mathias, J., and Bradford, J., concur.